No. 19,223.

JOSEPH P. RUTH, ET AL. *v.* DEPARTMENT OF HIGHWAYS, ETC.
(359 P. [2d] 1033)

Decided March 6, 1961.

Messrs. CRANSTONE AND ARTHUR, for plaintiffs in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. JOHN P. HOLLOWAY, Chief Highway Counsel, for defendant in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

BY this writ of error Joseph P. Ruth and The Ruth Company seek review of an award of $4,300 in a condemnation suit brought by the highway department of the State of Colorado. The Ruth Company is a corporation owned and controlled by Ruth; for convenience the plaintiffs in error will be referred to simply as Ruth.

The position of Ruth at the trial and before this Court is that the condemnation award is grossly inadequate, that in addition to the $4,300 awarded there was damage to the residue in the approximate amount of $100,000. He contends that certain rulings of the trial court on matters of evidence precluded him from adequately advancing his concept of value before the jury. These objections will be hereinafter considered specifically.

Ruth owns a tract of approximately 200 acres purchased by him in 1940 from the county commissioners of Clear Creek County for $500.00. This condemnation action was brought by the department of highways to acquire a right of way 190 feet wide in order to relocate and improve State Highway 103 which follows Chicago Creek from Idaho Springs to Echo Lake. The right of way for the old road was sixty feet wide. The widening of the right of way necessitated the taking of the approximately two acres of Ruth's land located on the flat ground at the bottom of the canyon through which the highway runs. The remainder of Ruth's property consists of a steep mountain to the west of the highway through which there is an old mine tunnel some 4000

feet in length built in 1900. The old road was located in such a position that it was possible to dump waste from the tunnel on the flat ground on both sides of the road, the waste being carried to the east side of the road by a trestle from the mouth of the tunnel over the road.

Ruth contends that taking of the 190-foot right of way destroys the value of the remainder of the 200-acre tract, the tunnel in particular, since the topography of the area is such that there is no other land available on which to dump the waste that would be produced if the tunnel were used in connection with mining operations. The particular claims which Ruth asserts could be profitably mined are known as the Dixie mine, not owned by Ruth, located some one thousand feet in from the breast of the tunnel.

The $100,000 sought by Ruth as damages is based on testimony as to the reproduction cost of the tunnel. Ruth testified that it would cost approximately $25,000 to extend the tunnel to the Dixie claim where it would enter several hundred feet below the present workings. His theory is that the Dixie mine has valuable gold deposits which could be worked more profitably through his tunnel rather than the shafts through which they are now being worked, and that this possible use of the land and the tunnel gave it a market value of $100,000 before this action was begun. He argues that the $100,000 reproduction cost figure is evidence of the market value of the tunnel. One witness, Giles, a miner, testified that in his opinion the value before condemnation was $100,000.

The trial court refused to admit in evidence ore samples from the Dixie mine, or settlement sheets between Ruth and the operators of the Dixie mine dating back to 1940 to show the value of the ore from the Dixie mine processed in his mill that year.

Ruth relies on two rulings by the trial court on the admission of evidence as the basis for his claim that the judgment be reversed. He contends, *first*, that Exhibit 23, a map showing the location of Chicago Creek in

1928, was admissible and that the trial court erred in excluding it as not being material to the issues in the case and, *second,* that an offer of proof relating to oral negotiations in Colorado Springs with certain parties concerning purchase of the property based on the contemplated use of the tunnel as a means of developing the Dixie mining claim, and the value of the Dixie ore, was rejected.

The question of admissibility of evidence to establish the value of the remaining property is the only one of substance. A lengthy tender was made at the trial by counsel for Ruth by which they offered to prove that negotiations were under way with a group in Colorado Springs to finance the extension of the Burns-Moore tunnel to the Dixie vein; that as a result of the bringing of the present condemnation action the negotiations were broken off because the other parties felt that after condemnation the property would be worthless; that there was sufficient ore in the Dixie vein to make the extension of the tunnel and subsequent mining operations profitable; that Ruth could obtain the necessary financing for such an enterprise. The offer of proof was objected to as being speculative on the question of value and hearsay with respect to the negotiations.

In its brief the Department of Highways cites authority for the proposition that offers to purchase are not admissible to establish market value because of their inherent unreliability for this purpose. *Loloff v. Sterling,* 31 Colo. 102, 71 Pac. 1113; *City and County of Denver v. Lyttle,* 106 Colo. 157, 103 P. (2d) 1. Similarly authority is cited to the effect that the tendered evidence of value and future profitability of operation was so speculative as to have been properly excluded. *Twin Lakes H. G. Min. Synd. v. Colorado Midland Railway Co.,* 16 Colo. 1, 27 Pac. 258; *Moffit v. City and County of Denver,* 57 Colo. 473, 143 Pac. 577; *Wassenich v. City and County of Denver,* 67 Colo. 456, 186 Pac. 533. The reply made by Ruth is that in proceedings of this kind it is open to the

owner of the property being taken not only to show its value as presently used but also its value when used in another manner which is shown to be reasonably feasible. He cites *Tulsa v. Creekmore,* 167 Okla. 298, 29 P. (2d) 101 (holding it proper to show the value of agricultural land if used for recreational purposes); 1 Nichols, *Eminent Domain,* sec. 219 (2d ed.), which states that it is proper to consider:

"* * * the possibility of its use for all purposes present and prospective, for which it is adapted and to which it might in reason be applied, and its value for the use to which men of prudence and wisdom and having adequate means would devote the property if owned by them . . ."

■ The first question to be considered in the light of the foregoing argument is whether the trial court was correct in excluding evidence of negotiations for the purchase of the entire property which were, we may assume, broken off on the initiation of condemnation proceedings. It is not contended that the negotiations with the group in Colorado Springs ever progressed to the point of sale or that there was even a firm offer to purchase. Such evidence is not relevant to establish the value of property to be taken by condemnation. This is quite apparent when it is noted that by a preponderance of authority evidence of actual offers to purchase is inadmissible, 2 Nichols, *Eminent Domain,* sec. 21.4 (3d ed. 1952); 18 Am. Jur. *Eminent Domain,* sec. 351 at 996 (1938); Annot., 7 A.L.R. 2d 797 (1949), although there are a few decisions which hold that on the laying of a proper foundation one may introduce evidence of a bona fide cash offer. 7 A.L.R. 2d 797 (1949). In view of the paucity of authority for even limited admissibility of evidence of an offer to purchase, it follows that evidence of mere negotiation would have no probative value in the present context.

■ A thorough discussion of the law of evidence applicable to a proceeding of this kind is contained in

*Wassenich v. City and County of Denver,* supra. The Court there pointed out that:

"As to the residue, the question was, how much is the present fair cash market value of the remainder of the land, not taken, decreased or diminished in value by reason of the improvement."

And that in determining the issues of value:

"The owner is entitled to have considered the most advantageous use in the future to which the land may be reasonably applied, not with the view of allowing him for speculative or prospective damages or values, but only as such evidence may bear upon or affect or assist in arriving at the present market value."

Here the jury was instructed that:

"In determining the present cash value, the most advantageous use of which the property may reasonably be applied may be considered. Any reasonable future use to which the land may be adapted or applied by men of ordinary prudence and judgment may be considered insofar only as it may assist you in arriving at the present market value. The owners are entitled to have considered the most advantageous use in the future to which the land may be reasonably applied, not with the view of allowing them for speculative or prospective damages or values, but only as such evidence may bear upon, affect or assist you in arriving at the present market value."

The jury found specially that the damage to the residue of Ruth's property was none.

Noteworthy also is the fact, shown by the evidence, that mining operations were suspended from 1940 to 1945 by a wartime order, and that since that time Ruth made no effort to arrange a contract with the owners of the Dixie mine, his entire theory of value depending on his being able to negotiate such an arrangement. No doubt the jury took this feature of the testimony into account in reaching its conclusion of no damage to the residue. Moreover, the evidence disclosed that the tunnel

had not been used for mining operations on a significant scale for over forty years.

■ We are of the opinion that the trial court was within proper bounds when it refused to admit the 1940 settlement sheets in evidence. Their bearing on value at the date of condemnation was too remote. Speculative evidence may not be submitted to a jury from which to make a determination of value. See *Farmers' Reservoir and Irrigation Co. v. Cooper,* 54 Colo. 402, 130 Pac. 1004. The trial court did allow Ruth to testify fully as to his theory of value and as to the fact that he had milled profitable quantities of ore for the operators of the Dixie mine in years past. The jury was certainly entitled to weigh the past history of the Burns-Moore tunnel against the glowing future predicted for it by Ruth in determining whether its present market value would be affected by the condemnation making it impossible to dump at the mouth of the tunnel. The jury was not required to accept Ruth's conclusions that profitable use of the tunnel for transportation could no longer be made once the old dump area had been taken by the state.

Ruth was given adequate opportunity to prove the damages resulting to the residue from this taking; the jury rejected his theories and its findings, being supported by the evidence, can not be justifiably disturbed.

The judgment is affirmed.

MR. JUSTICE SUTTON not participating.